**NOT FOR PUBLICATION**

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY
```

LAWRENCE RAMOY,                  :
                                 :   CIVIL ACTION NO. 05-3966 (MLC)
    Plaintiff,                   :
                                 :        **MEMORANDUM OPINION**
    v.                           :
                                 :
CREDIT SUISSE FIRST BOSTON       :
CORPORATION, et al.,             :
                                 :
    Defendants.                  :
                                 :

**COOPER, District Judge**

Plaintiff, Lawrence Ramoy ("plaintiff"), commenced this action on August 11, 2005 in this Court, against Credit Suisse First Boston Corporation ("Credit Suisse"), Group Long Term Disability Benefits for Employees of Credit Suisse First Boston, and Metropolitan Life Insurance Company ("Met Life") (collectively "defendants"). (Dkt. entry no. 1, Compl.) Plaintiff seeks, <u>inter</u> <u>alia</u>, "an adjudication that [plaintiff] is entitled to long term disability benefits in the amount of $25,000 per month from the date of his termination" and "entry of injunctive, restitution, and/or other equitable relief enjoining Defendants from violating the material terms and conditions of the CSFB Plan . . . and plan documents." (<u>Id.</u> at 11.) This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331 because the Group Long Term Disability Plan for Employees of Credit Suisse ("the Plan") is an employee welfare benefit plan governed by the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. The complaint insofar as asserted against Credit Suisse was dismissed by consent on January 18, 2006. (Dkt. entry no. 7.) The remaining defendants move for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 16.) Plaintiff opposes the motion. (Dkt. entry no. 17.) The Court, for the reasons stated herein, will grant the motion.

**BACKGROUND**

**I.    The Plan**

The Plan is established and maintained by Credit Suisse to provide long term disability benefits to its employees. (Defs. Stmt. of Mat. Facts, at ¶ 1; Compl., Ex. A.) The benefits provided through the plan are funded by a group policy issued by Met Life to Credit Suisse. (Id.) The maximum monthly benefit for employees such as plaintiff is $25,000. (Id. at ¶¶ 4-5; Pl. Stmt. Mat. Facts., at ¶¶ 4-5.)

The specific benefits to which a Plan participant is entitled are set forth in a summary plan description ("SPD"). (Id. at ¶ 5.) The definition of total disability under the Plan, as set forth in the Employee Benefit Handbook ("Handbook"), states:

> To be considered totally disabled, you must be unable to perform essential duties of your regular occupation. Disability must be due to accidental injury, sickness, mental illness, substance abuse or pregnancy.
>
> You need not be house confined to receive benefits under this Plan, but you must be under the care of a

>physician, and proof of disability satisfactory to the insurance company must be provided upon request.

(Id. at ¶ 6; Suter Aff., Ex. A., at CSFB0121.)  With respect to mental illness, the Handbook provides:

>Benefits will be payable for a disability caused by or contributed by neurosis, psychoneurosis, psychopathy, psychosis, alcoholism, drug abuse or the use of any drug (other than administered by a doctor) while you are confined to an institution for psychiatric disorders or a licensed hospital (but not a nursing or rest home), **or for up to a lifetime maximum of 24 months if not hospital-confined.**
>
>If you remain disabled after benefits cease and you are confined to a hospital again, benefits may be resumed during additional hospital confinements that occur within 6 months of the original confinement.

(Suter Aff., Ex. A., at CSFB0124 (emphasis added).)

**II.  Plaintiff's Request for Benefits Under the Plan**

Plaintiff applied for temporary disability on August 1, 2002.  (Suter Aff., Ex. C., at 148.)  On the application he listed (1) Dr. Varma has his primary attending physician, (2) the date his disability began and the day of first treatment for his condition as May 8, 2002, and (3) his last day of work as May 7, 2002.  (Id.)  Dr. Varma filled out the "Attending Physician Statement" and listed plaintiff's (1) primary diagnosis and treatment as "Major depression, single, severe", (2) subjective symptoms as, inter alia, "severe depression and suicidal thoughts . . . panic . . . withdrawn", and (3) current and recommended treatment plans as "anti-depressants" and "psychotherapy."  (Id.

3

at 151.)  Dr. Varma's prognosis was that plaintiff was "not in condition (psychologically) to return to work."  (Id. at 152.)

Plaintiff's application and medical records were referred to Met Life's Behavioral Health Unit ("BHU").  (Id. at 66; Defs. Stmt. of Facts, at ¶ 21.)  Plaintiff's wife also had numerous telephone conversations with Met Life regarding her husband's medical condition and treatment, and represented, inter alia, (1) plaintiff was having arterial difficulties, (2) in addition to seeing Dr. Varma, plaintiff also was seeing a cardiologist, Dr. Burns, and a vascular physician, Dr. Shafritz.  (Defs. Stmt. of Facts, at ¶ 21-22.)  Met Life's psychiatric clinical specialist interviewed plaintiff by telephone on August 30, 2002, and when asked why he left his job Met Life's records reflect that plaintiff responded:

> The stress of the job was just too much.  I couldn't handle it anymore.  People weren't talking to me.  I couldn't sleep anymore.  I started drinking heavily.  One day I just snapped & tried to kill myself drove around for 24 hrs looking for a place to crash my car.  It was the job.  Basically everything else was fine.  I'm basically burned out.  I didn't know what it was but Dr. Varma gave me the term for it.  I'm burned out.

(Id. at ¶ 23.)  When the specialist asked plaintiff whether it was his physical or emotional health that kept him from working, he responded "Emotional right now [and] certainly the physical will be a factor."  (Id. at ¶ 25.)

Met Life's psychiatric clinical specialist also spoke with Dr. Varma, and summarized that interview as follows:

4

> Psychiatrist is adamant that [plaintiff] suffering from a severe depression episode which preceded [plaintiff] going [out of work]. [Plaintiff] was self-medicating [with] heavy drinking & heavy gambling to provide a relief from his stress & depression & thru this was able to [continue] work. Psychiatrist states that [estimated return to work] is unknown & functional impairments are lack of concentration, memory impairments, and social isolation. Psychiatrist also noted that [plaintiff] has physical ailments but agrees that these are not affected or linked to [plaintiff's psychiatric] condition.

(Id. at ¶ 29.) Dr. Varma later told the BHU that plaintiff still had depression but that his medical conditions were his primary impairing conditions. (Id. at ¶ 37.) Based upon these representations, the BHU referred the matter back to Met Life's claims manager advising it should be returned to the BHU when the medical conditions were no longer the primary impairing conditions. (Id.; Suter Aff., Ex. C, at 82.)

Following the aforementioned conversation with Dr. Varma, Met Life received new medical records from Dr. Shafritz. (Suter Aff. Ex. C., at 388-410.) With regard to plaintiff's work ability restrictions, Dr. Shafritz noted in a letter dated November 18, 2002:

> His limitations to work are mostly on a psychiatric and stress based basis and are not secondary to his peripheral vascular disease or coronary disease. Although he does have coronary disease and peripheral vascular disease and he does have some disability with respect to these situations, his main limitation for continued work I believe is his amount of anxiety and stress related to his current employment situation. He has had all of the above health issues taken care of over the past 2 months, so he has been out of work for a while because of this. As I understand it correctly

5

> he has been cleared by his cardiologist to return to normal activity.  He will need to follow up with me in the future, perhaps at six month intervals, but at this time he is OK to return to work.  His only limitation to physical work from my standpoint would be that he cannot have a job where he needs to ambulate for long distances during the day because of his claudication syndrome.

(Id. at 403.)  A nurse consultant at Met Life again reviewed plaintiff's claim and concluded that plaintiff's cardiac condition did not preclude him from returning to work.  (Defs. Stmt. of Facts, at ¶ 84.)

Met Life issued plaintiff a letter dated December 5, 2002, approving his claim for long term disability benefits for the time period of November 5, 2002 through December 13, 2002. (Compl., at Ex. C.)  Met Life noted in the letter that in making its decision it relied upon, inter alia, (1) the medical documentation from Dr. Shafritz of plaintiff's coronary angioplasty on November 14, 2002, which cleared plaintiff to return to normal activity, and (2) medical documentation regarding plaintiff's diagnosis of depression, along with the phone conversation with Dr. Varma indicating plaintiff's "medical condition of atherosclerosis of the extremities is primary condition and that you are seeing Dr. Varma only in support of medical procedures."  (Id.)

Met Life sought further information from plaintiff if he was unable to return to work after December 13, 2002, and referred the matter back to the BHU.  (Id.; Defs. Stmt. of Facts, at ¶

6

42.) Plaintiff submitted a letter dated December 9, 2002, from Dr. DeNoia, who oversaw plaintiff's care for "hypertension, hyperlipidemia, peripheral vascular disease, and arteriosclerotic heart disease" since 1993. (Compl., Ex. D.) Dr. DeNoia noted that plaintiff:

> continues to have significant cardiovascular and peripheral vascular disease due to his severe hypertension and hyperlipidemia which has caused marked arteriosclerosis involving his extremities, as well as his heart. As you can see, he is on significant medications for anxiety/depression . . . . He is under a great deal of stress in his work, which, I feel, has contributed to his cardiovascular disease. Consequently, it is my opinion that [plaintiff] is totally disabled from his work. Indirectly, his work contributes to his coronary artery disease due to the stress levels involved in his job.

(Id.) Met Life also received additional records from Dr. Varma, indicating that plaintiff continues to be "severely depressed" and she saw plaintiff twice a week as well as prescribed a number of medications. (Defs. Stmt. of Facts, at ¶ 42-43.)

Met Life reviewed plaintiff's claim for disability benefits again, and in a letter dated May 7, 2003, informed plaintiff it was approving his claim for long term disability benefits for the period May 9, 2002 through November 4, 2004. (Compl., Ex. E.) The letter did not state the basis for its decision. (Id.) Plaintiff submitted a supplemental claim around June 6, 2003, accompanied by a physician statement from Dr. DeNoia. (Defs. Stmt. of Facts, at ¶ 50.) According to Dr. DeNoia, plaintiff's primary diagnosis was arteriosclerotic heart disease, and a

7

secondary diagnosis was peripheral vascular disease.  (Id.) Plaintiff's current treatment was listed as cardiac rehabilitation medication, and Dr. DeNoia noted that plaintiff "is stable medically at this time due to the fact that he is not working.  However, the stress of the job causes worsening of his atherosclerosis (heart and peripheral vascular disease)."  (Id.)

A Met Life nurse consultant evaluated plaintiff's supplemental claim and concluded that plaintiff's cardiac status did not support a finding he was unable to function at his own job.  (Id. at ¶ 51.)  The nurse, however, deferred opinion pending an evaluation by the BHU.  (Id.; Suter Aff, Ex. C, at 95.)  Met Life requested additional documents from Dr. Varma, and when it did not get a response, informed plaintiff and asked him to get the relevant records, if there were any.  (Defs. Stmt. of Facts, at ¶ 53.)  Met Life received additional medical records from Dr. DeNoia showing that plaintiff, inter alia, would "be subject to angina", had a "normal resting Doppler study", and "minimal arterial disease."  (Id. at ¶¶ 54-55.)

Met Life informed plaintiff via letter dated December 18, 2003, that they "completed [] review of your claim and determined that [] your claim has reached the maximum benefit payable under the Credit Suisse First Boston Group Plan for the conditions of depression and your claim will be terminated effective November 4, 2004." (Compl., Ex. F, "December 2003 decision".)  Plaintiff's

wife submitted an additional letter from Dr. DeNoia concerning plaintiff's cardiovascular and peripheral disease and treatment, including three angioplasties between 1999 and 2002.  (Defs. Stmt. of Facts, at ¶ 62.)

Plaintiff retained counsel and appealed from the December 2003 decision.  (Defs. Stmt. of Facts, at ¶ 64; Suter Aff., Ex. C, at 192.)  On appeal Met Life requested an independent physician consultant review of plaintiff's claim to determine whether the evidence supported any restrictions or limitations beyond November 4, 2004, relating to his "cardiac condition." (Suter Aff., Ex. C, at 190.)  Dr. Menotti, a board-certified internist, completed the evaluation on October 25, 2004. (Compl., Ex. H.)  Dr. Menotti concluded that the medical information did not support restrictions or limitations beyond October 4, 2004, and further opined:

> Based on the fact that the current medical throughout 2004 does not appear to substantiate worsening cardiac or peripheral vascular problems, it is the opinion of this reviewer at this point in time that the claimant appears to be medically stable at this point in time according to the objective medical information available for my review.

(Id.)

Met Life's decision to terminate benefits beyond November 4, 2004 was upheld on appeal.  (Compl., Ex. I.)  The procedure analyst concluded:

> In completing our appeal review, we have determined that although [plaintiff] had objective findings, he

9

>    did not meet the definition of disability.  In
>    reference to [plaintiff's] depression, this falls under
>    the Limited Benefit Condition plan provision and the
>    maximum benefits allowed for this condition have been
>    allowed.  In reference to [plaintiff's] cardiac
>    condition, medical documentation submitted does not
>    support a severity to preclude [plaintiff] from being
>    able to perform the duties of his own occupation for
>    any employer in his local economy.  [Plaintiff] has not
>    required further angioplasties of his left lower
>    extremity or heart since 2002 and [plaintiff] continues
>    to smoke which may contribute in some degree to
>    arterial spasm throughout the circulatory system.  The
>    medical documentation in the file appears to indicate
>    that [plaintiff's] cardiac condition is stable and
>    there is no indication to substantiate a worsening
>    cardiac or peripheral vascular problem.

(Id.)  Plaintiff then brought this action.  (Dkt. entry no. 1.)

## DISCUSSION

**I.    Legal Standards**

   **A.    Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e).  A non-movant must

present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or

is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

### B. Applicable Standard Of Review

ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Court should review a denial of ERISA plan benefits under a de novo standard of review unless the benefit plan gives the administrator or fiduciary of the plan discretionary authority to determine benefits eligibility or construe the plan's terms. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If the plan confers such discretion, the Court should apply a deferential "arbitrary and capricious" standard. Id. at 111-12; Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 194 (3d Cir. 2002). Under the arbitrary and capricious standard, the Court must uphold the plan administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pinto v. Reliance Stand. Life Ins. Co., 214 F.3d 377, 392 (3d Cir. 2000); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997). "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the

12

[administrator] in determining eligibility for plan benefits." Mitchell, 113 F.3d at 439 (alteration in original).

"[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations." Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004). Accordingly, an insurance company that both funds and administers benefits is generally acting under a conflict that warrants the Court applying a heightened form of the arbitrary and capricious standard of review. Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004); Firestone, 489 U.S. at 115 ("If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."). Thus, if a potential conflict exists, the Court must employ a "sliding scale" method and match its degree of scrutiny with the degree of conflict. Kosiba, 384 F.3d at 64. Specifically, the Court must

> take into account the following factors in deciding the severity of the conflict: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction.

Stratton, 363 F.3d at 254 (cites and quotes omitted).

13

## II. Legal Standards Applied Here

### A. Applicable Standard of Review

The Court previously granted the motion by the remaining defendants to the extent it sought to have the Court apply the arbitrary and capricious standard of review, but denied the motion without prejudice insofar as it sought to apply the arbitrary and capricious standard of review without any heightened scrutiny. (Dkt. entry no. 12.) Plaintiff now argues that the Court should apply a "heightened arbitrary and capricious" standard "[b]ecause of the inherent conflict created when a company which is financially at risk is charged with interpreting whether to honor claims under its policy, the insurance company's conduct must be closely scrutinized." (Pl. Br., at 5-6.) The remaining defendants "admit that there is an inherent conflict in accordance with Third Circuit precedent, but assert that based upon the process by which Met Life reached its ultimate claim determination, this Court should hold that the process was untainted by conflict" and accordingly apply "the most stringent arbitrary and capricious standard of review." (Defs. Reply Br., at 8.)

The Court will apply the "sliding scale" method to determine whether a conflict exists warranting application of a heightened form of the arbitrary and capricious standard. See Stratton, 363 F.3d at 254; Kosiba, 384 F.3d at 64. The fourth sliding-scale

14

factor, which addresses the financial or structural deterioration of the plan fiduciary, is not relevant here. See Stratton, 363 F.3d at 254. With respect to the first and second factors, although plaintiff presumably did not possess a sophisticated understanding of the Plan's benefits, all Credit Suisse employees receive the SPD, and Met Life directed plaintiff to the specific Plan SPD provisions that it relied upon in addressing his benefits request. See id.

With regard to the third factor, the remaining defendants admit "the exact financial arrangement between the insurer and the company," Stratton, 363 F.3d at 254, in this situation creates an "inherent conflict of interest." (See Defs. Reply Br., at 8.) Thus, despite the plaintiff's failure to identify any evidence supporting his general allegations as to conflict of interest, the Court will apply a heightened arbitrary and capricious standard in reviewing the denial of plaintiff's request for benefits to account for any potential structural conflict that may exist here. See Kosiba, 384 F.3d at 68.

**B.   Review of Met Life's Determination**

Met Life's decision that plaintiff is not entitled to continued benefits under the Plan is not arbitrary and capricious even when reviewed under the heightened standard. The Court disagrees with plaintiff's argument that "while Met Life created a voluminous 'administrative record' designed to give the

15

appearance of investigating Mr. Ramoy's medical claim, it substantively did not do so." (Pl. Br., at 6.)  To the contrary, the record demonstrates that Met Life considered the complete administrative record, which included multiple reviews by its own psychiatric clinical specialists, registered nurses, an independent board-certified internist, as well as plaintiff's own physician, Dr. Shafritz, who all concluded that Ramoy's disability was caused by or contributed by a mental disorder. The record supports Met Life's decision that plaintiff's cardiac condition was not serious enough to support a finding that plaintiff could not return to his own job as of November 4, 2004.

The Court notes plaintiff's argument that "Met Life myopically re-focused on the records addressing Mr. Ramoy's stress and depression to the exclusion of updated information regarding his life-threatening arteriosclerotic disease that confirmed the medical basis of his total disability" is squarely refuted by his own doctors.  The record demonstrates that Met Life considered the information from Dr. DeNoia concerning plaintiff's arteriosclerotic heart disease and peripheral vascular disease submitted in support of plaintiff's June 2003 supplemental claim.  None of the records submitted by Dr. DeNoia, however, demonstrated a decline or worsening of plaintiff's condition, and rather reiterated his history of cardiac conditions and the link between the stress of his job and his

16

cardiac conditions.  Thus, it was not arbitrary or capricious for Met Life to rely on the aforementioned other medical records in concluding that plaintiff's cardiac status did not support a finding he was unable to function at his own job.

The Court, moreover, finds it significant that Met Life's decision was supported in part by the medical documentation from one of plaintiff's other doctors, Dr. Shafritz, which cleared plaintiff to return to normal activity after his coronary angioplasty on November 14, 2002.  The medical documentation provided by Dr. DeNoia did not reveal any other significant treatment or worsening of plaintiff's cardiac condition after he was cleared by Dr. Shafritz following his November 2002 angioplasty.  Thus, even after applying a heightened arbitrary and capricious standard, the Court finds that the defendants' determination that plaintiff is not entitled to disability benefits under the Plan was not unreasonable, erroneous, or unsupported by substantial evidence.  See Pinto, 214 F.3d at 392-93 (explaining that in applying a heightened arbitrary and capricious standard of review, the court is "deferential, but not absolutely deferential"); Mitchell, 113 F.3d at 439.

The defendants followed the claims procedures set forth in the Plan SPD in evaluating plaintiff's request, and responded to his appeal appropriately.  Further, the defendants considered the Plan provisions relating to both plaintiff's mental and physical

illnesses, as evidenced by the moving of his file between the claims specialists and the BHU.  Thus, the Court finds that the plaintiff has failed to rebut the remaining defendants' prima facie showing that the determination was reasonable and the process utilized to reach this determination was proper.  See Pinto, 214 F.3d at 392-93 (stating that in applying a heightened arbitrary and capricious standard of review a court must "look not only at the result – whether it is supported by reason – but at the process by which the result was achieved").  Therefore, the remaining defendants are entitled to summary judgment.

## CONCLUSION

The Court, for the reasons stated supra, will grant the motion for summary judgment and enter judgment in favor of the remaining defendants.  The Court will issue an appropriate order and judgment.

                                          s/ Mary L. Cooper  
                                          **MARY L. COOPER**  
                                          United States District Judge